

**FILED**

Oct 12 2017, 10:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Evan K. Hammond
Grant County Public Defender
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mark Reed,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 12, 2017

Court of Appeals Case No.
No. 27A02-1704-CR-699

Appeal from the Grant Superior
Court

The Honorable Jeffrey D. Todd,
Judge

Trial Court Cause No.
27D01-1604-FA-1

**Brown, Judge.**

[1] Mark Reed appeals his conviction for child molesting as a class A felony. Reed raises one issue which we revise and restate as whether the trial court erred in denying his motion to dismiss. We affirm.

*Facts and Procedural History*

[2] At some point in 2001 when J.D. was ten years old, she met Reed who had started dating her mother, and J.D.'s mother stayed with Reed in La Fontaine, Wabash County, Indiana, and later in a trailer near Monticello, White County, Indiana. J.D. and A.D., who was J.D.'s sister and two years younger than J.D., lived primarily with their father but visited their mother and Reed. J.D.'s mother left J.D. and A.D. in Reed's care while she was at work. Reed told J.D. that she "looked like Brittany Spears" and he wished he "could eat her up." Transcript Volume 2 at 109-110. Reed would always want J.D. to sit next to him on the bench seat in the truck and would try to hold her hand or place his hand on her leg. In 2001 and 2002, Reed would touch J.D.'s knee and sometimes place his hand between her thighs while sitting next to him in a vehicle.

[3] On one occasion when J.D. and A.D. were alone with Reed in the trailer house near Monticello while J.D.'s mother was at work, Reed told J.D. and A.D. that a spirit named Freddie would enter his body and make him do bad things, that one little boy had not listened to Freddie and had to be punished, and that the boy had his intestines strung throughout some trees as punishment for not listening to Freddie. Reed sent A.D. out to play, he told J.D. that she needed to

listen to Freddie and that meant she needed to give him a hug before she could leave, he wrapped his arms around her, and he "reached his arm around and grabbed [her] butt and squeezed really tight and held [her] there." *Id.* at 119.

[4] On another day in the summer of 2002 when J.D.'s mother was at work, Reed drove J.D. and A.D. in the truck from Monticello to Matter Park in Marion, Grant County, Indiana. After they exited their vehicles, Reed was going to show J.D. something. He and J.D. walked without A.D. toward a tree line, "there was a no trespassing sign in the trees and . . . a little walkway past it," and they walked past the sign and through the tree line into a little clearing from where J.D. could not see anyone. *Id.* at 125. As they walked, Reed told J.D. that Freddie was back. He told her to take her shorts and underwear off and get down on her knees, and she lowered her shorts and underwear to around her ankles and got on her hands and knees. Reed got on his knees behind her, took "his hands and . . . start[ed] feeling [J.D.'s] whole genital area," "he would take his hand and go from the front to the back feeling everything," and "he would grab [her] butt cheeks and spread [th]em apart." *Id.* at 132. Reed told J.D. not to look at him, to look down, and to be quiet. He touched her vagina and "his finger went in a little bit." *Id.* at 133. He also placed "one hand on each side of [J.D.'s] butt cheeks," with "his thumbs inside [her] butt cheeks," and it felt to J.D. like his thumbs were "[p]ressing on [her] anus." *Id.* at 135. Reed told J.D. she could put her shorts back on, she did so, and they walked back toward the vehicle. While walking back, Reed threw himself into the field, started wiggling and jerking around on the ground, and

said that Freddie was leaving his body. Reed then asked J.D. "what Freddie did" and "wanted [her] to describe what happened." *Id.* at 140. The following day, Reed told J.D. not to tell anyone and, if she did, Freddie would "make [her] disappear," and J.D. thought that "disappear" meant that Reed would kill her. *Id.* at 144-145. A couple of days later, Reed was arrested on another matter. His relationship with J.D.'s mother ended following the arrest.

[5] At some point prior to January 2008, J.D. disclosed that Reed had molested her to A.D. and her friend N. and told them not to say anything. J.D. also wrote a letter to one of her former boyfriends telling him that she had been molested, she let him read it in her presence, he gave the letter back to her, and she kept the letter. When she was sixteen years old, J.D. saw Reed in a convenience store, and she "was just frozen" and "so scared." *Id.* at 153. J.D. saw Reed walk outside and enter a vehicle with a woman and two children and drive away. J.D. called A.D. and was crying and upset. At some point after seeing Reed at the store, J.D. told her mother that Reed had molested her, and J.D. and her mother contacted the police.

[6] Marion Police Officer Austin Lamb prepared a report in July of 2008. Marion Police Detective Larry Shaw was assigned the case involving J.D. The initial report reflects that a copy of the report was sent to the Monticello Police Department in White County. Also in July 2008, J.D. was interviewed at the Child Advocacy Center, and Detective Shaw as well as a member of the Grant County Prosecutor's staff, Lisa Glancy, attended the interview. A description of the incident at Matter Park in Grant County was disclosed during the Child

Advocacy Center interview. J.D. went with a police officer to Matter Park to point out the location of the incident. Detective Shaw had difficulty in contacting or finding Reed and "in keeping communication with the victim, J.D.'s mother." *Id.* at 64. Representatives from the Grant County Prosecutor's Office assisted J.D. and her mother in filling out paperwork for a protective order against Reed. The case against Reed for molesting J.D. was not presented to the prosecutor's office for review at that time.

[7] In January or February of 2016, Jay Kay ("Investigator Kay"), an investigator with the Grant County Prosecutor's Office, while investigating a case involving another person who said she had been molested by Reed, discovered the 2008 report regarding Reed molesting J.D. Investigator Kay reviewed J.D.'s interview at the Child Advocacy Center, interviewed J.D., took photographs at Matter Park, obtained the letter J.D. had written to her former boyfriend, and contacted A.D., J.D.'s mother, N., J.D.'s former boyfriend, Harold Reed ("Harold"), who was Reed's uncle, and Michael Reed ("Michael"), who was Reed's cousin.

[8] On April 21, 2016, the State charged Reed with numerous counts of child molesting including two counts of child molesting of J.D. as class A felonies.[1] Count I alleged that, on or about January to August 2002, Reed placed his finger in J.D.'s vagina, and Count II alleged that, on or about January to

---

[1] Reed was also charged with four additional counts of child molesting as class A felonies, four counts of child molesting as class C felonies, and child exploitation as a class C felony, all related to other victims.

August 2002, Reed placed his finger in J.D.'s anus. The State also alleged Reed was an habitual offender. Reed filed a motion for severance of counts, and the court ordered that the charges in which J.D. was the alleged victim, Counts I and II, would be severed and tried separately from the counts related to other alleged victims.

[9] On January 5, 2017, Reed filed a Motion to Dismiss Counts I and II arguing that the counts alleged the incidents occurred on or about January to August 2002 and that the delay in filing charges against him violated his due process rights and impaired his ability to mount a defense. On January 6, 2017, the court held a hearing on Reed's motion at which Investigator Kay indicated that he spoke with Detective Shaw and that his understanding was "that there was a little bit of attempt to investigate at that time." Transcript Volume 2 at 53. When asked "[i]s the only police report in this case that you were able to find was the one created by [Officer] Lamb, and uh, his contact with . . . the mother of the victim," Investigator Kay responded affirmatively. *Id.* at 59. Investigator Kay further indicated that the Child Advocacy Center interview "was the only source of a crime against J.D. occurring in Grant County" and that, to his knowledge, there were "no reports generated after the [Child Advocacy Center] interview . . . where J.D. described being molested at Matter Park" and "there was . . . nothing generated that could be presented to the prosecutor to review the case." *Id.* at 60. He also indicated that his understanding in reviewing the case was that Detective Shaw "had difficulty in contacting, finding [Reed] and in keeping communication with the victim, J.D.'s mother." *Id.* at 64. The

court denied Reed's motion to dismiss. A jury trial was commenced on January 9, 2017, at which the State presented the testimony of, among others, J.D., J.D.'s mother, A.D., J.D.'s friend N., and Investigator Kay, and Reed presented the testimony of J.D.'s former boyfriend, Harold, and Michael.[2] Reed renewed his motion to dismiss, and the court denied the motion. Reed moved for directed verdicts on both counts, and the court denied a directed verdict on Count I and granted a directed verdict on Count II. The jury found Reed guilty on Count I and determined that he was an habitual offender.[3]

## *Discussion*

[10] The issue is whether the trial court erred in denying Reed's motion to dismiss. Reed contends the State's delay in bringing the molesting charge against him violated his due process rights. It is well-settled that a defendant has the burden of proving, by a preponderance of the evidence, all facts necessary to support a motion to dismiss. *Schiro v. State*, 888 N.E.2d 828, 833-834 (Ind. Ct. App. 2008), *trans. denied*. Because Reed appeals from a negative judgment, we will

---

[2] J.D. testified that Harold and a boy who was older than her traveled to Matter Park in a separate vehicle and, after exiting their separate vehicles, Reed told A.D. to wait with Harold and that Reed was going to show J.D. something. When asked why she did not turn and run after Reed said that Freddie was back, J.D. testified "I didn't know what would happen if he would try to hurt me, and just the fact that, uh, his uncle let me go off with him, I didn't know if he was involved." Transcript Volume II at 138. J.D. testified that, when she exited the wooded area, she saw that A.D. was with Harold and that she was crying. J.D. further testified that she knew who Harold was and that she had been in his presence before.

[3] The abstract of judgment indicates that Counts III through XI are pending.

reverse only if the evidence is without conflict and leads inescapably to the conclusion that he is entitled to a dismissal. *See id.* at 834.

[11] Reed asserts that the witnesses' recollections have been impacted by the passage of time, "[h]ad the case been followed up on and investigated in 2008 when it was filed, the period of time to remember would have only been 6 years as opposed to 14 to 15 years," and "[i]t isn't possible to determine what the testimony of these witnesses would have been had the charges been brought during a reasonable time after the initial report." Appellant's Brief at 12-13. He argues that the State presented no justification for the delay in filing charges against him from 2008 until 2016 and that he has shown he suffered actual and substantial prejudice to his right to a fair trial and asks that his motion to dismiss be granted.

[12] The State maintains that Reed's due process rights were not violated by the delay between the initial report to police in 2008 and the filing of charges in 2016. It argues that Reed did not prove he suffered actual and substantial prejudice due to the delay, that the only persons present at the time of the molesting were Reed and J.D. and thus there was no potential witness who could have refuted J.D.'s testimony about the crime but for a faded memory, that Reed has not identified any witness who was unable to testify effectively due to a lack of memory, and that Harold, Michael, J.D.'s former boyfriend, A.D., and N. all had sufficient memory of the events to be able to testify about them. The State further maintains that there is no evidence that it deliberately decided to delay bringing charges to try to gain a tactical advantage, that it

gained no tactical advantage as a result of the delay, and that it suffered just as much if not more harm than Reed due to the delay. It also states that "[i]t is not clear from this record whether charges against [Reed] were ever filed in White County, but this is a situation where it may have been the case that each jurisdiction thought the case was being pursued by the other jurisdiction" and that, "[a]lthough a Grant County deputy prosecutor and a Marion detective were present" during the Child Advocacy Center interview, "when the incident occurring in Grant County was disclosed, the initial confusion over where jurisdiction lay likely contributed to the case falling through the cracks, particularly as no follow-up police report was ever filed regarding the crime taking place in Grant County." Appellee's Brief at 21, 21 n.12.

[13] Prosecutors generally are invested with broad discretion in the decision of such matters as when to prosecute and are not under any duty to bring charges as soon as probable cause exists. *Schiro*, 888 N.E.2d at 834. However, the discretion is not limitless, and the Due Process Clause of the Fifth Amendment protects defendants against excessive pre-indictment delay. *Id.* Ordinarily, a charge filed within the statutory limitations period will be considered timely. *Id.* However, if the prosecution deliberately utilizes delay to strengthen its position by weakening that of the defense or otherwise impairs a defendant's right to a fair trial, an inordinate pre-indictment delay may be found to violate a defendant's due process rights. *Id.*

[14] To obtain relief, a defendant must first demonstrate that he suffered actual and substantial prejudice to his right to a fair trial. *Id.* Should a defendant

overcome that burden, he must then demonstrate that the State had no justification for the delay. *Id.* (citing *Harris v. State*, 824 N.E.2d 432, 437 (Ind. Ct. App. 2005); *Johnson v. State*, 810 N.E.2d 772, 775 (Ind. Ct. App. 2004), *trans. denied*). The defendant must establish that the State delayed the indictment to gain a tactical advantage or for some other impermissible reason. *Id.* (citing *Marshall v. State*, 832 N.E.2d 615, 626 (Ind. Ct. App. 2005), *trans. denied*).

[15] The mere passage of time between the commission of the crime and an indictment is not presumed to be prejudicial to a defendant. *Id.* To satisfy the threshold burden of prejudice, a defendant must make specific and concrete allegations of prejudice from the delay that are supported by the evidence. *Id.* A defendant must do more than show that a particular witness is unavailable and that the witness's testimony would have helped the defense; he must also show that the witness would have testified and withstood cross-examination and that the jury would have found the witness credible. *Id.* (citing *United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1998), *cert. denied*, 528 U.S. 896 (1999)). "Delay and missing evidence can hurt the prosecution just as much as, if not more than, it hurts the defense." *Glenn v. State*, 884 N.E.2d 347, 354 (Ind. Ct. App. 2008), *trans. denied*.

[16] Turning to Reed's argument, we first note that there is no statute of limitations for filing a class A felony charge. *See* Ind. Code § 35-41-4-2(c) ("A prosecution for a Class A felony (for a crime committed before July 1, 2014) . . . may be commenced at any time."); *Johnson*, 810 N.E.2d at 775. We thus turn to

whether Reed has shown that he suffered actual and substantial prejudice to his right to a fair trial and that the State had no justification for the delay and delayed the indictment to gain a tactical advantage or for some other impermissible reason. To the extent Reed argues that the sheer length of the delay resulted in prejudice, we have held that the mere passage of time is not presumed to be prejudicial to a defendant. *See Schiro*, 888 N.E.2d at 834; *Glenn*, 884 N.E.2d at 353.

[17] Further, Reed does not argue or point to the record to show that any witness helpful to his defense had become unavailable. In addition, he does not demonstrate that the witnesses who did testify at his trial, including those he called as defense witnesses, were unable to testify due to faded memories or were equivocal due to diminished memories such that his right to a fair trial was substantially prejudiced.

[18] The record reveals that J.D. testified that she was alone with Reed when the crime occurred and that Reed's defense counsel thoroughly cross-examined her regarding her recollection of the offense, the circumstances surrounding the offense and her interactions with Reed and others, and other details and events of her childhood. J.D.'s mother testified regarding her relationship with Reed, the fact that Reed cared for J.D. and A.D. when she was at work, that she lived with Harold and his girlfriend when she first moved to the area near Monticello, and as to the timeline of her relationship with Reed and interactions with Harold and his girlfriend. Reed's defense counsel thoroughly cross-examined J.D.'s mother regarding her visitation with J.D. and A.D., the

timeline of her relationships and living arrangements, her employment in Monticello and her transportation and work hours, the vehicles she, Reed, and Harold drove, and the fact A.D. had informed her after she returned home from work that Reed had taken J.D. and A.D. to Marion. A.D. testified that she remembered taking a trip to Matter Park in the summer of 2002 during which Reed told her to go catch butterflies, Reed and J.D. went off by themselves and walked into a wooded area past a no trespassing sign, and when they returned J.D. was crying and did not want to stand up on her own. A.D. was able to testify that her recollection was that Reed drove her and J.D. to Matter Park, that no one else was present, and that she was all alone while Reed and J.D. were in the wooded area. Reed's defense counsel thoroughly cross-examined A.D. regarding her recollection of the trip to Matter Park with Reed and J.D. as well as of other surrounding events and events of her childhood. J.D.'s friend N. testified that she remembered J.D., telling her about an inappropriate touching in 2007 or 2008, and Reed's defense counsel cross-examined N. regarding her relationship with J.D. and when J.D. told her about the touching. Reed does not demonstrate that the State's witnesses were unable to testify due to faded memories such that his right to a fair trial was substantially prejudiced.

[19] As for Reed's witnesses, Harold indicated that he did not come into contact with J.D. or A.D. from January through August of 2002, that when he knew J.D.'s mother he did not know she had daughters, and that he never recalled going to Matter Park with J.D. and A.D. The prosecutor thoroughly cross-examined Harold regarding his criminal history and prior burglary convictions,

his trips to Marion, where he lived, and how well he knew Reed and J.D.'s mother. Michael testified that he met J.D.'s mother when she was with Reed in the Monticello area, that he remembered meeting J.D. and A.D. in White County when Reed was attempting to rent a trailer, and that he did not recall ever being with J.D. or A.D. at Matter Park. The prosecutor cross-examined him regarding how much time he spent with Reed when he lived in Monticello, the fact he made many trips with Harold to Marion to see family, and the fact that more than once he rode with Harold and they would follow Reed's vehicle to Marion. J.D.'s former boyfriend testified regarding dating J.D. and that he had not received the letter from J.D., and the prosecutor cross-examined him regarding the length of his relationship with J.D. Reed does not show that his witnesses were unable to testify due to faded memories.

[20] Based upon our review of the testimony elicited from the witnesses presented by the State and Reed on direct and cross-examination, we find that Reed has not shown that any witness had become unavailable or that the witnesses were unable to testify due to diminished memories. The delay did not give the State an advantage over Reed in terms of preparing for trial. We conclude that Reed has not demonstrated that he suffered actual and substantial prejudice to his right to a fair trial by the delay in charging him.

[21] Further, even assuming Reed were able to show actual prejudice, he does not establish that the State delayed the filing of the charge to gain a tactical advantage or for some other impermissible reason. Officer Lamb filed a report in July 2008, Detective Shaw was assigned the case, and the report was sent to

the Monticello Police Department. Although a member of the Grant County Prosecutor's staff and Detective Shaw were present at the July 2008 interview at the Child Advocacy Center during which J.D. first disclosed the molestation at Matter Park, the record shows that Detective Shaw made an attempt to investigate at the time and had difficulty in maintaining communication with J.D.'s mother. Investigator Kay learned of the 2008 report in January or February of 2016, he interviewed J.D. and investigated the case, and the State filed charges against Reed in April of 2016. We cannot find on the record before us, including that it appears J.D. reported molestations by Reed in White County as well as Grant County, that the State waited until 2016 to charge Reed because it harbored a plan to gain a tactical advantage over him, that the State was motivated by some other impermissible purpose, or that the delay was simply unexplained.

[22] Based upon the record, Reed has not demonstrated that the evidence is without conflict and leads inescapably to the conclusion that he was entitled to dismissal. Accordingly, we do not disturb the trial court's ruling or Reed's conviction. *See Schiro*, 888 N.E.2d 835-838 (concluding the defendant did not establish actual or substantial prejudice stemming from a witness's dimmed memory and finding nothing in the record suggested the State waited to charge the defendant because it harbored a plan to gain a tactical advantage over him, that it was motivated by some other impermissible purpose, or that the delay was simply unexplained); *Johnson*, 810 N.E.2d at 775-776 (concluding that the defendant did not demonstrate actual prejudice by a thirteen-year pre-

indictment delay as he did not explain how the deceased witnesses' testimony would have helped his defense and the delay did not give the State any advantage over the defendant in terms of preparing for trial and that, even if he had shown prejudice, he did not show the evidence was without conflict and led to the conclusion that the State's delay was without justification).[4]

## Conclusion

[23] For the foregoing reasons, we affirm the trial court's denial of Reed's motion to dismiss and his conviction for child molesting as a class A felony.

[24] Affirmed.

Najam, J., and Kirsch, J., concur.

---

[4] Reed cites *Barnett v. State*, in which prison inmate Barnett argued his defense in a prosecution for the murder of a fellow inmate was impaired by a twelve-year delay because several key witnesses had died or were unable to be located and his ability to cross-examine the witnesses who did testify was diminished by their faded memories. 867 N.E.2d 184, 186 (Ind. Ct. App. 2007), *trans. denied*. This Court observed that the issues were whether Barnett acted in self-defense and whether another inmate or inmates with a knife may have also stabbed the victim causing the fatal wound, a number of key witnesses died and several more no longer had any recollection of the events which gave rise to the case, there were apparently at least twenty inmates out of their cells and in the area when the incident occurred, the lack of key witnesses made it difficult for Barnett to support his claim of self-defense, there was a shakedown of the areas after the incident and six knives were found, and there was no evidence of who possessed the knives, whether more than one knife was used in the stabbing, or which knife caused the wound which caused the victim's death. *Id.* at 187-188. After reviewing the evidence, we concluded that Barnett was prejudiced by the State's unjustified delay in bringing charges. *Id.* Reed, unlike Barnett, has not established that any witness had become unavailable or that any of the witnesses who testified at his trial were unable to testify due to diminished memories. Reed does not identify any defense or defense theory that was prejudiced by the loss of evidence. We find *Barnett* to be distinguishable. *See Glenn*, 884 N.E.2d at 353-354 (observing that, in *Barnett*, key witnesses had died and Barnett's ability to cross-examine other witnesses was greatly diminished by their faded memories and that these facts were particularly significant in light of Barnett's defenses that he acted in self-defense and another inmate caused the fatal wound; that, as in *Barnett*, certain evidence was lost over the years including that a detective had died and police notes and reports as well as the murder weapon and crime scene video were lost; and that Glenn, unlike Barnett, did not identify any specific defense theory that was prejudiced by the loss of evidence, and concluding that Glenn failed to make specific and concrete allegations of prejudice that were supported by the evidence).